IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **STRAGENT, LLC,**<br><br>*Plaintiff,*<br><br>v.<br><br>**VOLVO CAR USA, LLC,**<br><br>*Defendant.* | **Case No. 1:22-cv-00293-JDW** |

### MEMORANDUM

As I've noted before, there are things that you guess and things that you know. *See Alchem Inc. v. Cage*, Case No. 2:20-cv-03142, 2021 WL 4902331, at * 1 (E.D. Pa. Oct. 21, 2021). And only the latter gets past summary judgment. In a patent case, judges and jurors don't know much, and the parties often rely on experts to fill in the gaps. But parties can't have an expert take a guess, dress it up as a fact, and use it to avoid summary judgment. Instead, an expert has to lay out the factual basis for her opinions. For infringement opinions, the expert has to provide enough of a factual foundation for a judge to be able to determine that the features of an accused product support a finding of infringement.

In this case, there's a gap in the evidence that Stragent, LLC developed as to whether the cars that Volvo Car USA LLC ("VCUSA") sells infringe on Stragent's patent. Stragent got an expert to opine that the cars infringe. A close examination of the expert's opinion reveals that she doesn't have a factual basis for her infringement opinion. Instead,

she rolled out her proverbial Jump To Conclusions mat,[1] made a logical leap, and then dressed it up as fact. She's not allowed to do that, and without her opinion, Stragent has no evidence of infringement. I will therefore grant VCUSA's summary judgment motion.

I.  **BACKGROUND**

   A.  **Factual History**

      1.  **The '765 Patent**

Stragent, LLC owns United States Patent No. 9,705,765 (the "'765 Patent"), which is "generally directed to using automotive [electronic control unit ("ECU")] gateway middleware having associated 'bulletin board' memory that allows for 'real-time' sharing of information across different in-vehicle networks[.]" (D.I. 54 at 2 (quotations omitted).) For example, the '765 patent states that multiple automotive ECUs "control complex applications such as engine control, brake control, or diagnostics" and are "connected through wired multiplexing bus-systems such as [CAN], Flexray, LIN," and others. (D.I. 1-4 at 3:23-24, 3:36-40.) The different ECUs "use[] a common, or shared storage system that is connected to all of the system networks through network interfaces." (*Id.* at 7:44-46.)

The only claim still at issue in this case is Claim 31 of the '765 Patent. Claim 31 depends from Claim 24. Claim 24, in turn, recites an apparatus that can, among other things, receive an electronic message on a Flexray network, determine if there is available storage for that message, and, "if the storage resource is not available, ascertaining

---

[1]   *See* Office Space (20th Century Studios 1999).

2

whether a threshold has been reached and re-trying an access in connection with the storage resource if the threshold has not been reached[.]"[2] (D.I. 1-4 at 16:38-41.) I have construed the claim term "re-trying an access in connection with the storage resource" as "making another attempt to ascertain or decide the availability of a storage resource." (D.I. 23 at 10.)

### 2. AUTOSAR

Stragent describes AUTOSAR as an enabling technology that provides for a layered system for sharing information in a car across different networks. A consortium of car manufacturers issued AUTOSAR guidelines and standards, and "[a]ll automobile manufacturers have adopted AUTOSAR …." (Appx. 3599 at ¶ 26.) According to Stragent, "[t]he AUTOSAR standards facilitate the exchange and update of software and hardware over the service life of a vehicle by providing a common software infrastructure for automotive systems of all vehicle domains based on standardized interfaces for the different software layers." (D.I. 1 at ¶ 8.)

Over the years, car manufacturers have increased cars' functionality "to improve safety, increase performance, reduce environmental impact, and enhance comfort and provide more functional benefits to the automobile occupants." (Appx. 3597 at ¶ 19.) To do this, manufacturers rely on control modules such as ECUs, and those ECUs share information about various applications across different networks or buses. Stragent

---

[2]   Claim 24 is much longer, but the quoted part is what matters for this motion.

contends that the ECUs contain software components that conform to AUTOSAR specifications.

Though "[a]ll automobile manufacturers have adopted AUTOSAR," some manufacturers "may not enable the 're-trying an access' feature, which is optional" under AUTOSAR. (Appx. 3629 at ¶¶ 26, 92.) If a "manufacturer [does] not enable the 're-trying an access' feature, they would have to take other action to avoid a blockage of information flow." (*Id.* at ¶ 93.) That could include increasing storage capacity, even if it doing so was costly.

### 3. Volvo's implementation of AUTOSAR

Volvo Car Corporation ("VCC") manufactures cars that contain ECUs that implement certain AUTOSAR standards. VCUSA sells those cars in the United States. There are different types of ECUs in those cars, including a Central Electronic Module ("CEM"), Engine Control Modules ("ECMs"), Active Suspension Control ("SUM"), and a Driver Information Module ("DIM"). Bosch manufactures DIM ECUs for VCC. VCC provides Bosch with a statement of work and DIM software specifications including: (a) Software Requirement Specification DIM (SWC: DIM 519A Base Technologies / MAIN; 0), Revision 1 ("DIM1"); (b) Software Requirement Specification DIM (SWC: DIM 519A Base Technologies / MAIN; 3), Revision 5 ("DIM2"); and (c) Software Requirement Specification

DIM (SWC: DIM 519A Base Technologies / MAIN; 3), Revision 5 ("DIM3").[3] These are the only documents that VCC gives to Bosch that contain information regarding the DIM ECU's communication protocols.

VCC does not require Bosch to implement all of the specifications in DIM1, DIM2, and DIM3. If VCC requires a particular specification, then it designates that specification as "REQPROD,"[4] and it incudes a corresponding ID number. VCC has "an agreement that Bosch should not implement anything other than REQPRODs" in the ECUs that it makes for VCC, and VCC "instructed Bosch to implement only REQPRODs, not all other text that is mentioned" in the DIM specifications. (Appx. 8184:25 – 8185:3, 8186:16-18.)

Stragent's infringement expert, Eileen Davidson, opines that VCC's Specification 7.1.2.1.5—General allocation of buffers requirements—demonstrates that the ECUs in the cars that VCUSA sells satisfy the "re-trying an access" limitation in Claim 24. (*See* Appx. 3776.) In rendering this opinion, Ms. Davidson relies on a figure in the specification that states: "If no buffer is currently available use flow control WAIT mechanism until a buffer is available (marked free) or time-out on transport protocol level. Messages shall never be dropped due to temporary occupied buffers, unless timeout on transport protocol level." (Appx. 3758.) But this specification is not designated as REQPROD. By its terms, the

---

[3] For ease of reference, I use the same naming conventions that the Parties used in their briefing. Both DIM2 and DIM3 have the same title, and it is not clear whether they contain any substantive differences. However, DIM2 is designated as "PRELIMINARY," while DIM3 is designated as "RELEASED" with a release date of 2018-02-01.

[4] REQPROD stands for "requirement production."

specification "does not specify exactly how buffer allocation shall be implemented," leaving that decision "up to the implementer," and it describes the figures and explanatory comments that follow as "two examples of two different buffer allocation algorithms." (Appx. 7340-7341.) According to VCC's System Architect, Magnus Jakobsson, the DIM ECU employs a "fire and forget" feature whereby "[i]f there is not space in the message buffer for an incoming message, then the incoming message is discarded and **no subsequent attempt is made to load the incoming message to the message buffer**." (Appx. 4190-4191 at ¶ 8 (emphasis added).)

Stragent points out that the explanatory comments that accompany the figures beneath Specification 7.1.2.1.5 refer to a "flow control WAIT mechanism," and "FlowControl Wait" or "FC.Wait" appears elsewhere in DIM3, including in specifications VCC designates as required. For example, Specification 4.6.1.1.3.4.1—"FlowControl Wait usage," is designated as REQPROD and sets forth that "[t]he gateway ECU shall use FC.Wait if it receives a message when buffers are not available for receiving the complete message." (Appx. 7130.) Mr. Jakobsson issued DIM3, but he did not write this particular specification. Though he testified as to his "general understanding" and interpretation of the specification (Appx. 8122:9, 19), he confirmed that has no understanding of what the FC.Wait function is. (*Id.* at 8123:23 – 8124:2.) In her expert report, Ms. Davidson does not explain what FC.Wait does or how it works. Nor does she explain how utilizing FC.Wait or

not dropping messages meets the claim limitation of "re-trying an access," according to my construction of that term.

Indeed, there is no evidence in the record that explains what the FC.Wait mechanism is or what it does. Other REQPROD specifications also refer (or allude) to the FC.Wait mechanism, but none of those specifications explains how it operates.[5] There are other specifications in DIM3 that seem to describe similar functions, but those specifications either are not desginated as REQPROD or do not refer to FC.Wait.[6]

## B.  Procedural History

Stragent filed suit against VCUSA on March 4, 2022, asserting that VCUSA's use of AUTOSAR technology in its cars infringes four of Stragent's patents, including the '765 Patent. Following the close of discovery, the Parties filed a Stipulated Partial Dismissal, dismissing all of Stragent's claims with prejudice, except for its claim of willful infringement of Claim 31 of the '765 Patent.

VCUSA moved for summary judgment on Stragent's remaining claim. To support its motion for summary judgment, VCUSA submitted a declaration from Mr. Jakobsson in

---

[5]  *See* Appx. 7130 (Specification 4.6.1.1.3.5.1 – C_WFTmax); Appx. 7139-7140 (Specification 4.6.1.1.3.9.4 – C_Br in non-programming session for FC.CTS, ABT and OVFLW); Appx. 7338 (Specification 7.1.2.1.4.6 – Flow control mechanism for diagnostic messages).

[6]  *See* Appx. 7338 (Specification 7.1.2.1.4.8 – Separate buffers for requests and responses); Appx. 7340 (Specification 7.1.2.1.4.11 – Multiple CPU design in the GW ECU; Appx. 7346-7347 (Specification 7.1.2.1.6.3 – Wait for available communication channel); Appx. 7350-7352 (Specification 7.1.3.1.1.2 – Functional requests to all ECUs).

which he stated that the DIM ECU employs the "fire and forget" feature, but VCUSA had not disclosed Mr. Jakbosson or his declaration during discovery. Stragent moved for partial summary judgment, seeking to preclude any evidence or testimony based on the belated declaration, *inter alia*, and it also moved for summary judgment as to VCUSA's affirmative defenses. I held a hearing regarding Stragent's request to exclude Mr. Jakobsson's declaration and declined to do so because there was an opportunity to cure the prejudice to Stragent. Instead, I reopened discovery for the limited purpose of permitting Stragent to depose Mr. Jakobsson and gather documents related to the statements he made in his declaration. I also permitted the parties to exchange supplemental expert reports and briefs. The Parties have done so, and the various motions for summary judgment are ripe for disposition.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead, he must show where in the record there exists a genuine dispute over

a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B). If he fails to make this showing, then the court may "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(3).

## III. DISCUSSION

Stragent cannot overcome summary judgment because Ms. Davidson's conclusory infringement opinion does not create a genuine dispute of material fact. "To satisfy the summary judgment standard, a patentee's expert must set forth the factual foundation for [her] infringement opinion in sufficient detail for the court to be certain that features of the accused product would support a finding of infringement under the claim construction adopted by the court, with all reasonable inferences drawn in favor of the non-movant." *Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1183 (Fed. Cir. 2009) (citation omitted). Pointing to various references to the FC.Wait mechanism and to not dropping messages in the DIM3 specifications does not support a finding of infringement because Ms. Davidson does not explain what the FC.Wait mechanism is, how it works, or how utilizing FC.Wait or not dropping messages means that there is another attempt to ascertain or decide the availability of a storage resource. In other words, she renders a conclusion as to infringement without explaining *how* or *why* she reached that conclusion. Ms. Davidson also points to a "timeout" function, but she fails to explain what

9

the timeout is and how it relates to making another attempt to ascertain whether a storage resource is available. As a result, her opinion does not create a genuine dispute of material fact as to whether ECUs in the cars that VCUSA sells practice the "re-trying an access in connection with the storage resource if the threshold has not been reached" limit.

"Conclusory expert assertions cannot raise triable issues of material fact on summary judgment." *Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 941 (Fed. Cir. 2013) (quotation omitted).[7] And Stragent "may not avoid that rule 'by simply framing the expert's conclusion as an assertion that a particular critical claim limitation is found in the accused device.'" *Intell.*, 589 F.3d at 1184 (quotation omitted).[8] But Ms. Davidson does just that. In the claim chart attached to her Opening Expert Report, Ms. Davidson states—in a conclusory fashion—that DIM Specfication 7.1.2.1.5 "clearly shows the limitation." (Appx. 3756.) But she ever explains how or why this is so. Instead, she copies and pastes the entire specification into the claim chart and leaves it to the trier of

---

[7] Regional circuit law governs the sufficiency of an expert's opinion at summary judgment. *See Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1183-84 (Fed. Cir. 2009) (citation omitted). Similar to the Federal Circuit, a plaintiff in the Third Circuit cannot defeat summary judgment with "speculation and conjecture," *Wharton v. Danberg*, 854 F.3d 234, 244 (3d Cir. 2017), or with "conclusory, self-serving affidavits." *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012).

[8] *See also Leonard v. Stemtech Health Scis., Inc.*, No. 08-cv-67, 2011 WL 6046701, at *23 (D. Del. Dec. 5, 2011), report and recommendation adopted, 2012 WL 1133185 (D. Del. Mar. 28, 2012) ("The simple fact that an opinion is offered into evidence by way of expert report does not turn an opinion into a fact.").

fact to figure out how using "flow control WAIT mechanism until a buffer is available (marked free) or time-out on transport protocol level" and not dropping messages equates to "making another attempt to ascertain or decide the availability of a storage resource"—the governing construction of the claim language at issue. (*See id.* at 3758.) For example, she does not explain how waiting for a buffer to become available constitutes *making another attempt* at determining whether a storage resource is available. Likewise, she does not explain how holding messages and/or not dropping them constitutes making another attempt.

It might be clear to Ms. Davidson, but that does not mean it is clear to a trier of fact. "An expert's unsupported conclusion on the ultimate issue of infringement will not alone create a genuine issue of material fact." *Intell.*, 589 F.3d at 1184 (citation omitted). Ms. Davidson's mere say-so isn't sufficient to create a genuine dispute of material fact. Instead, she must explain how using FC.Wait or not dropping messages infringes the "re-trying an access" limitation. Because she doesn't, her expert report does not support a finding of infringement.

Neither Ms. Davidson's Reply Expert Report nor her Supplemental Expert Report sheds any more light on the issue. Instead, she continues to point to other DIM3 specifications that refer to a wait mechanism and/or specifications that state that messages should not be dropped. But absent any analysis as to why these functions

require or constitute making another attempt to determine if a storage resource is available, the fact that they appear in certain required specifications doesn't mean much.

## IV. CONCLUSION

Ms. Davidson doesn't know if the FC.Wait feature satisfies the retrying requirement of the '765 Patent; she jumps to that conclusion. But that guess can't get Stragent past summary judgment. Therefore, VCUSA is entitled to summary judgment. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

**Date**: April 1, 2024